FILED IN CLERK'S OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

AUG 0 5 2010

| | | |
|---|---|---|
| TRAVAMERICA, INC., | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | CIVIL ACTION |
| V. | ) | FILE NO. 1 10 · CV - 2454 |
| | ) | |
| INTERTRAVEL, S.A.R.L., | ) | |
| GLOBALIA CORPORACION | ) | TCB |
| EMPRESARIAL, S.A., | ) | |
| GLOBALIA EXPLOTACIONES | ) | |
| HOTELERAS, S.L.U., and | ) | |
| OPERADORA GLOBALIA de | ) | |
| MEXICO, S. de R. L. de C.V., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff TravAmerica, Inc. ("TravAmerica") hereby files its Verified Complaint for Injunctive Relief and Damages against Defendants Intertravel, S.A.R.L. ("Intertravel"), Globalia Corporacion Empresarial, S.A. ("Globalia"), Globalia Explotaciones Hoteleras, S.L.U. ("Globalia Hotels"), and Operadora Globalia de Mexico, S. de R. L. de C.V. ("OGM") (together, "Defendants") and in support thereof, shows the Court the following:

## INTRODUCTION

1.     TravAmerica brings this action to stop Defendants from unlawfully misappropriating TravAmerica's exclusive rights to commercialize ten hotels located in the Cancun and Riviera Maya areas of Mexico. Defendants are all related corporations; with Intertravel, Globalia Hotels and OGM being directly or indirectly wholly owned subsidiaries of Globalia, a multi-billion dollar international conglomerate. This case involves Defendants' illegal scheme to misappropriate for their own gain and benefit the income derived from the sale of these hotels' accommodations (the "Commercialization Rights" as hereinafter defined). Defendants began this scheme after Defendant Intertravel lost the Commercialization Rights pursuant to a binding Arbitration Award issued on April 7, 2010.

2.     Before losing the Commercialization Rights, Intertravel held them pursuant to an agreement with Frida Investments, S.A.R.L ("Frida") (the Luxembourg Agreement"). Under the Luxembourg Agreement, Intertravel agreed to pay Frida  Two Million Dollars ($2,000,000) for the month of December 2006, Twenty-Eight Million Dollars ($28,000,000) for the year 2007, and Forty-Two Million Six Hundred and Forty Thousand Dollars ($42,640,000) for the year 2008, with that amount to increase by 3% in each

successive year for the duration of the contract between Frida and Intertravel.

3.     Intertravel failed to meet its obligations to Frida for the year 2009 and, as a result, lost the Commercialization Rights pursuant to the Arbitration Award, which has been confirmed as a final, binding and non-appealable Luxembourg judgment.     Intertravel was also ordered to pay Frida the amount of $45,236,776 (US).

4.     Despite the loss of these rights, and repeated demands to cease and desist, Defendants continue to exploit illegally the Commercialization Rights, now paying nothing.     Defendants are misappropriating the Commercialization Rights and all monies earned as a result of their unlawful exploitation.

5.     For the past 18 years, TravAmerica has held the exclusive contract rights to exploit the Commercialization Rights.     TravAmerica held the Commercialization Rights for the last 3 1/2 years under contract with Intertravel until April of this year when Intertravel lost them.     As a direct result of Intertravel's loss of the Commercialization Rights, Intertravel terminated the Intertravel/TravAmerica Services Agreement.     With the termination of the Services Agreement, TravAmerica was forced to cease

operating as an ongoing business, and had to lay off almost all of its employees. Those few who remain cannot conduct any productive business.

6.      Thereafter, Frida and TravAmerica entered into a contract effective as of July 1, 2010 pursuant to which TravAmerica again obtained the Commercialization Rights. TravAmerica is now vested exclusively with the right to exercise the Commercialization Rights in the United States, Canada, and Europe. TravAmerica now desires to resume its business operations, but Defendants' actions are completely preventing it from doing so.

7.      Despite Intertravel's admitted loss of the Commercialization Rights, it and the other Defendants have undertaken a calculated scheme to exploit the Commercialization Rights in contravention of TravAmerica's exclusive rights thereto and in open defiance of the Arbitration Award and Luxembourg judgment.

8.      TravAmerica seeks an injunction to prohibit Defendants from continuing to illegally misappropriate the Commercialization Rights under Georgia's Unfair and Deceptive Trade Practices Act and Georgia's RICO Act. TravAmerica also seeks damages to compensate it for its losses and damage to its good will and reputation as a direct and proximate result of

Defendants' theft and misappropriation of the Commercialization Rights and revenue derived from their exploitation.

### PARTIES, JURISDICTION, VENUE AND ALTER EGO

9.     TravAmerica is a Georgia corporation duly authorized to transact business in the State of Georgia with its principal place of business located at 4505 Peachtree Lakes Drive, Duluth, Georgia 30096.

10.    Defendant Intertravel is a Luxembourg company with its office located at 123-125 avenue du X Septembre, L 2551, Luxembourg, Luxembourg.   Intertravel is subject to the jurisdiction and venue of this Court pursuant to Georgia's Long Arm Statute, by virtue of its contracts with and control over its former agent, TravAmerica, and its continuous and systematic contacts with the State of Georgia, as described below. Intertravel is a co-conspirator with the other Defendants.

11.    Defendant Globalia is a Spanish corporation with its office located at Carretera de El Arenal Km. 21, Centro Empresarial Globalia, Polígono de Son Noguera, 07620 Llucmajor, Palma de Mallorca, Spain.   Globalia is subject to the jurisdiction and venue of this Court pursuant to Georgia's Long Arm Statute, by virtue of its continuous and systematic contacts with the State of Georgia, its control of the Intertravel contracts with

TravAmerica, and because it is the alter ego of Intertravel. Globalia is a co-conspirator with the other Defendants.

12.    Defendant Globalia Hotels is a Spanish corporation with its office located at Carretera de El Arenal Km. 21.5, Centro Empresarial Globalia, Polígono de Son Noguera, 07620 Llucmajor, Baleares, Spain.    Globalia Hotels is subject to the jurisdiction and venue of this Court pursuant to Georgia's Long Arm Statute, by virtue of its continuous and systematic contacts with the State of Georgia, its control of the Intertravel contracts with TravAmerica, and because it is the alter ego of Intertravel. Globalia Hotels is a co-conspirator with the other Defendants.

13.    Defendant Operadora Globalia Mexico ("OGM") is a Mexican company with its office located at Blvd. Kukulcan Km 6.5, Zona Hotelera, Cancun, Quintana Roo 77500, Mexico.  OGM is subject to the jurisdiction and venue of this Court pursuant to Georgia's Long Arm Statute, by virtue of its continuous and systematic contacts with the State of Georgia, its control of the Intertravel contract with TravAmerica, and because it is the alter ego of Intertravel.  OGM is a co-conspirator with the other Defendants.

14.    Defendants are all related corporations; with Intertravel, Globalia Hotels and OGM being directly or indirectly wholly owned subsidiaries of

Globalia.   Attached hereto as Exhibit A is a true and correct corporate hierarchy chart showing the Defendants' corporate relationships.   Attached hereto as Exhibit B is a true and correct copy of a Globalia organization chart showing the positions of and relationships of certain Globalia employees.   Attached hereto as Exhibit C is a true and correct copy of certain pages from Globalia's 2009 Annual Report providing some background and explanation of Globalia's corporate structure, as well as showing Globalia's gross revenues for fiscal year 2009 being 2.828 million Euros, or more than $3 billion (U.S.) (Exhibit C at 4).

15.    Defendants have systematically and continuously for a period of approximately three and one-half years purposefully availed themselves of the protections of the laws of the State of Georgia by transacting business in the State of Georgia.  Defendants' numerous tangible and intangible contacts with Georgia include, but are not limited to, the following:

    a.   As part of a larger transaction described below, on November 28, 2006, Intertravel entered into two contracts with TravAmerica. The first contract is termed a "Services Agreement" (the "Services Agreement").   A true and correct copy of the Services Agreement is attached hereto as Exhibit D (without exhibits).   Pursuant to the

Services Agreement, TravAmerica became the exclusive representative of Intertravel in the United States and Canada to coordinate and be responsible for the marketing, sales, invoicing, and collections for booking certain hotels' accommodations located in the Cancun and Riviera Maya, Mexico areas. The term of the contract was approximately 11 years.

b. The Services Agreement contains a Georgia choice of law clause that provides: "This agreement and the rights and obligations of the parties hereto shall be governed by and construed and enforced in accordance with the laws of the State of Georgia." *Id.* at 10, Section 7.10.

c. On November 28, 2006, Intertravel and TravAmerica entered into a second contract that is essentially a management agreement (the "Management Agreement"), which gave Intertravel the right to control all significant management decisions of TravAmerica. A true and correct copy of the Management Agreement is attached hereto as Exhibit E.

d. The Management Agreement provided **Globalia** – not Intertravel – with the right to jointly make decisions with TravAmerica on

TravAmerica's "organization chart, functions or job descriptions of employees, base workforce and new hirings and personnel selection ...." *Id.* at 3, ¶ 6.

e. The Management Agreement also provides that "[d]ecisions on dismissals or final settlements of personnel: According to the general agreement, 100% of the cost borne by Travamerica [sic] in the first six months and by **Globalia** and Travamerica [sic] (50% each) in the following period until the end of the agreement." *Id.* at 3, ¶ 7 (emphasis added).

f. Beginning in November 2006 and continuing at least until April 2010, employees, officers and directors of Globalia, Globalia Hotels and OGM disregarded the separateness of their legal entities and Intertravel by the commingling, confusion and overlapping of money, records, operations, personnel and control.

g. Globalia, Globalia Hotels, and OGM conducted their own and Intertravel's businesses on an interchangeable and joint basis as if they were one such that there is a unity of interest and ownership and the separate personalities of the corporations no longer exist.

h. Globalia, Globalia Hotels and OGM have used Intertravel to defeat justice, perpetrate fraud, and to evade responsibility for their actions.

i. Globalia's, Globalia Hotels' and OGM's operation and control of Intertravel's business is shown by the many meetings between TravAmerica's employees and Globalia's, Globalia Hotels, and OGM's employees to address the performance of the Services Agreement. No Intertravel employees were present at any of these meetings. These meetings include, but are not necessarily limited to, the following:

1) In January 2007, an introductory meeting was held at Globalia's request in Madrid, Spain with Francisco Gimena, Director of the Hotel Division of Globalia and Joaquin Caldentey, a Globalia Hotel Division "director commercial," with TravAmerica's vice president, Enrique Klein.

2) In March 2007, a meeting was held with Francisco Gimena, Fernando Rúa, an OGM Director, and TravAmerica's vice president, Enrique Klein, during the 2007 Acapulco Tianguis

event in Acapulco, México, to address contracts with tour operators for the following year.

3) In November 2007, a meeting was held in London, England prior to the World Travel Mart congress with Francisco Gimena, Globalia's sales and marketing team and TravAmerica's vice president, Enrique Klein.

4) In December 2007, a meeting was held with Francisco Gimena and the complete Globalia sales and marketing team from Europe, Mexico and North America during the first marketing and sales Annual Conference in Cancun, Mexico. TravAmerica's president, Joaquin Tarazona and its vice president, Enrique Klein and OGM's director of finance, Guillermo Pañeda, also attended.

5) In February 2008, TravAmerica's Joaquin Tarazona was summoned to a budget review meeting at Globalia's corporate office in Palma de Mallorca with Francisco Gimena, Juan Pedro Quintana, a Globalia Administrative director, Guillermo Borras, a Globalia Hotels Control Director, and Gabriel Estela, a sub Director General for Globalia Hotels. During this meeting

TravAmerica was introduced to Globalia's corporate auditors and Globalia's director of the treasury as the complete Globalia accounting team controlling the TravAmerica/Intertravel relationship.

6) In September 2008 a meeting was held in Cancun, Mexico with the participation of the Globalia sales and marketing team, as well as Fernando Rua, Francisco Gimena, with Enrique Klein.

7) In December 2008, a meeting was held with José Duato, a Director General of Globalia Hotels, Fernando Rúa, Miguel Marcos, a Globalia Hotels director of human resources, and Juan Carlos Fernández, a Globalia Hotels employee, in Cancún México. Globalia's Financial Director, Miguel Angel Sanchez, also attended.

8) In March 2009, a regional Meeting for Globalia's Mexico Hotels Division was held with Fernando Rua, Edith Sanchez and Monica Siliceo, who are responsible for Oasis sales in Mexico and South America.

9) In October 2008 and October 2009, meetings were held with Fernando Rua, in preparation of the Cancun Travel Mart show, with TravAmerica's vice president, Enrique Klein.

10) Multiple meetings were held during 2008 and 2009 between Fernando Rua, TravAmerica and various customers such as Apple Vacations, Pleasant Holidays, and Expedia.

11) In May 2009, there was a corporate Sales & Marketing meeting with Jose Duato, Miguel Marcos, Carlos Lopez, a Globalia Hotels Director of Operations, Fernando Rua, Joaquin Caldentey, and Andrea de Alier, a Globalia Hotels Division marketing employee, with TravAmerica's vice president, Enrique Klein. This meeting took place in Globalia's corporate office in Palma de Mallorca, Spain.

12) In 2009, a meeting/presentation, prepared at the request of Globalia by the sales and marketing team of TravAmerica in Atlanta, was held for the business and marketing plan for the introduction of the new "Harlequin Hotel in St. Vincent" for Globalia. Carlos Lopez, and Miguel Marcos, a Globalia Hotels director of human resources, attended on behalf of Globalia.

13) Numerous meetings in Cancun, Mexico (at least 6-8) were held with Fernando Rua and Guillermo Pañeda during the period of summer 2007 and spring 2010.

j.  Beginning in November 2006 and continuing through at least April 2010, Globalia, Globalia Hotels and OGM engaged in systematic and continuous contacts with TravAmerica in the State of Georgia via electronic mail, telephonic communications, facsimile transmissions and visits to the State of Georgia. Attached hereto as composite Exhibit F is a small sampling of the hundreds of emails (with certified translations as necessary) between TravAmerica, Globalia, Globalia Hotels and OGM, evidencing that Globalia, Globalia Hotels and OGM were controlling all significant aspects of Intertravel's and TravAmerica's business. These communications cover all operational, accounting and financial issues relating to the Services Agreement, and there are none from or to "Intertravel" so denominated. A sampling follows:

1) Globalia dictated the precise language that was required to be included on all invoices sent to third parties by TravAmerica, instructing TravAmerica to represent to third parties that it was

Intertravel's agent and that invoices sent by TravAmerica were sent on behalf of Intertravel: "Travamerica [sic], Inc. is an independent agent of its principal, Intertravel SARL. This invoice has been issued in the name and on behalf of Intertravel, SARL." *See* e-mail dated January 10, 2007, from Mr. Juan Pedro Quintana (jpquintana@globalia-corp.com), Globalia's Director de Administracion, to Mr. Joaquin Tarazona, TravAmerica's President.

2) Globalia required that Ms. Carmen Taracena Directora de Tesoreria (Treasury) de Globalia and Pilar Luque Directora de Financiera (Finance) de Globalia be kept apprised regarding transfers of funds from TravAmerica. *See* e-mail dated January 31, 2007 from Mr. Quintana to Mr. Tarazona.

3) Globalia required that a monthly hotel bookings report be prepared by TravAmerica and forwarded to Gabriel Estela, Globalia's Subdirector General for the Hotels Division. *See* e-mail dated July 30th, 2007, from Gabriel Estela (gabriel.estela@globalia.com) to Mr. Tarazona.

4) Globalia required that the "Commercial Report: Mexico Hotels" be prepared weekly on the Monday of each week in addition to at the close of each month. *See* e-mail dated August 6, 2007 from Mr. Estela to Mr. Tarazona.

5) Globalia directly controlled the flow of money earned pursuant to the Services Agreement from TravAmerica to the Intertravel bank account. The Intertravel bank account in Miami was established by Globalia employees and instructions for its use, including usernames and password access, were transmitted directly by e-mail from Carmen Taracena, Dtra. Tesoreria Grupo Globalia (carmen.taracena@globalia-corp.com), to Joaquin Tarazona, TravAmerica's President, by e-mail dated December 17, 2007. Globalia later provided a check scanner in Georgia for TravAmerica's use in depositing checks.

6) Globalia required that TravAmerica provide a list of invoices relating to the Oasis Cancún complex for the month of March 2008 and March 2007. *See* e-mail dated April 14, 2008 from Mr. Estela to Mr. Tarazona.

7) Globalia issued "standards to be followed for issuing Credits to Clients." Questions regarding this policy were to be directed to the "corporate department of Accounts Receivable." *See* e-mail dated January 28, 2009 from Mr. Quintana, per the instructions of Globalia's Office of the Director General, to Mr. Tarazona.

8) Globalia oversaw and approved client refunds. *See* March 9, 2009 e-mail from Mr. Estela.

9) Globalia's approval was required for special promotional offers to clients. *See* e-mail dated April 30, 2009 from Carlos Lopez, Globalia Hotels Director de Operaciones, to Mr. Enrique Klein of TravAmerica.

10) Globalia determined which hotels would be available for booking. *See* e-mails dated June 11, and June 23, 2009 from Carlos Lopez to Enrique Klein.

11) Globalia established criteria for annual budgeting that included the process, prices and investments, repairs and maintenance to hotels. *See* e-mail dated August 5, 2009 from Carlos Lopez to Enrique Klein.

12) Globalia required TravAmerica to report advertising contributions and commissions earned corresponding to each hotel for which bookings were made. *See* December 9, 2009 e-mail from Angela Sanchez, Dpto. Admon., Division Hotelera Globalia (angela.sanchez@globalia-corp.com).

13) Globalia required TravAmerica to generate a weekly sales report with production in rooms per night and revenue, a monthly sales report and a monthly sales report with comparison to prior year's production. *See* e-mail dated December 21, 2009 from Carlos Lopez, Globalia Hotels Director de Operaciones, to Mr. Enrique Klein of TravAmerica.

14) Globalia's approval was required to reduce the price at which rooms could be booked. *See* e-mails dated January 5, February 9 and February 23, 2010 from Alexandra Victoria, Commercial Director Harlequin Hotels Division, Sales Coordinator Mexico (a.victoria@hotelsoasis.com) to Enrique Klein.

15) Globalia conducted periodic audits of TravAmerica's accounts, expenses, reservations, books and records. *See* e-mails dated January 12, 2010 from Bartolome Mir Tugores,

18

Depto. de Auditoria Interna e Inspeccion, Globalia Servicios Corporativos (bmir@globalia-corp.com), to Mr. Tarazona and February 10, 2010 e-mail from Noelia Llaneza Arizabalaga (noelia.llaneza@globalia-corp.com).

16) Globalia directed TravAmerica to transfer funds between accounts to facilitate payments to Globalia's related entity, Carribbeds. *See* April 16, 2010 email from Pilar Luque (pluque@globalia-corp.com), Globalia's Finance Director, to Mr. Tarazona.

17) Globalia requested that TravAmerica return the Citibank check scanner to Intertravel. *See* email dated April 21, 2010 from Juan Pedro Quintana to Mr. Tarazona.

k. For the year 2007, $49,066,119.98 was paid directly to TravAmerica in Atlanta, Georgia by tour operators, travel agencies, and wholesalers as a result of TravAmerica's performance of its rights and obligations under the Services Agreement. From this amount, TravAmerica deducted its fee of $2,131,427. The remaining funds were deposited into an account opened by TravAmerica under the name TravAmerica-Intertravel.

*See* Exhibit G, a true and correct summary of revenue generated in 2007, 2008, 2009, and 2010.

l. For the year 2008, $61,183,570.05 was paid by tour operators, travel agencies, and wholesalers as a result of TravAmerica's performance of its rights and obligations under the Services Agreement. Approximately $41,000,000 of this amount was paid by tour operators, travel agencies, and wholesalers directly to a bank account in Miami, Florida that was opened by Globalia in Intertravel's name. The remaining amount of approximately $20,200,000 was paid by tour operators, travel agencies, and wholesalers via check and credit card to TravAmerica in Atlanta, Georgia. From the monies paid to TravAmerica, it deducted its fee of $2,293,276. TravAmerica transferred the remaining amount to the Miami bank account controlled by Globalia. *See* Exhibit G.

m. For the year 2009, $55,196,235.18 was paid by tour operators, travel agencies, and wholesalers as a result of TravAmerica's performance of its rights and obligations under the Services Agreement. Approximately $41,000,000 of this amount was paid directly to a bank account in Miami, Florida that was opened by

Globalia in Intertravel's name. The remaining amount of approximately $14,000,000 was paid by tour operators, travel agencies, and wholesalers via check and credit card to TravAmerica in Atlanta, Georgia. From the monies paid to TravAmerica, it deducted its fee of $2,101,599. TravAmerica transferred the remaining amount to the Miami bank account controlled by Globalia. *See* Exhibit G.

n. For the first four months of the year 2010, $23,098,290.67 was paid by tour operators, travel agencies, and wholesalers as a result of TravAmerica's performance of its rights and obligations under the Services Agreement. Approximately $17,000,000 of this amount was paid directly to a bank account in Miami, Florida that was opened by Globalia in Intertravel's name. The remaining amount of approximately $6,100,000 was paid by tour operators, travel agencies, and wholesalers via check and credit card to TravAmerica in Atlanta, Georgia. From the monies paid to TravAmerica, it deducted its fee of $1,193,438.03. TravAmerica transferred the remaining amount to the Miami bank account controlled by Globalia. *See* Exhibit G.

o. Between January 2007 and April 2010, over $1,500,000 of the monies paid was generated by Vacation Express, an Atlanta, Georgia company.

p. During this time, out of the $188,544,215.90 paid under the Services Agreement, Globalia transferred to itself approximately $6,500,000 directly from the account, and it controlled the disbursements of the remaining funds to other entities, including Intertravel and two entities controlled by Globalia identified in the wire transfer records as Carribbeds and International Citibusiness.

q. In March, 2007, Franciso Gimena, General Manager and Director of the Hotel Division of Globalia, visited TravAmerica's Atlanta, Georgia office.

r. In the summer of 2007, Juan Carlos Fernandez and Francisco Perez, employees of a related Globalia company, visited TravAmerica's Atlanta, Georgia office to study the computer programs to reduce redundancy and costs.

s. In the fall of 2008, Fernando Rua and Guillermo Paneda, Directors of OGM, visited TravAmerica's Atlanta, Georgia office to discuss open operational issues.

t. In June 2008, Bartolome Mir Tugores, a Globalia company auditor, visited TravAmerica's Atlanta, Georgia office to audit books, records, and accounts.

u. In March 2010, Bartolome Mir Tugores and Noelia Llaneza, Globalia company auditors, visited TravAmerica's Atlanta, Georgia office to audit contracts and reservations.

v. During the period of November 28, 2006 through April 2010, there were hundreds, if not thousands, of telephone calls between TravAmerica and Globalia, Globalia Hotels and OGM officers and employees.

w. During the period of November 28, 2006 until the termination of the Services Agreement in April 2010, no persons identified as Intertravel employees were party to any of these communications with TravAmerica.

x. Intertravel has no employees, no assets and no organizational structure. The individual who executed the Services Agreement on behalf of Intertravel, Michel de Graaf, is listed as an employee of Globalia, as a "Director Comercial Europa." *See* Exhibit B, at 2.

16.     This Court has jurisdiction of this matter pursuant to 28 USC § 1332, as TravAmerica and the Defendants have a diversity of citizenship and the amount in controversy exceeds $75,000.

17.     Venue is proper in this Court pursuant to 28 USC § 1391(a) and (d).

## FACTUAL ALLEGATIONS

18.     TravAmerica is a hotel marketing company that has been engaged in the hotel marketing business since TravAmerica was incorporated in Georgia more than eighteen years ago, in or about April 1992.

19.     Beginning in about 1992 and continuing until November, 2006, TravAmerica held the exclusive rights in the United States and Canada to market and book hotel rooms in the Cancun and Riviera Maya area, Mexico for a number of hotel properties operating under various forms of the trade name "Oasis." A true and correct copy of one such contract for the year 2002 is attached hereto as Exhibit H. These properties, as of November 2006, included:

a. Grand Oasis Cancun, a five star hotel located at Blvd. Kukulcan Km. 16.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

b. Oasis Cancun, a four star hotel located at Blvd. Kukulcan Km. 16.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

c. Grand Oasis Playa, a five star hotel located at Blvd. Kukulcan Km. 19.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

d. Grand Oasis Rivera Maya, a five star hotel located at Km. 251 Carretera Chetumal, Puerto Juarez, Akumal, Quintana Roo 77780 Mexico;

e. Oasis Palm Beach, a four star hotel located at Blvd. Kukulcan Km. 4.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

f. Grand Oasis Caribbean Resort, a five star hotel located at Blvd. Kukulcan Km. 4.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

g. Oasis Viva Beach, a four star hotel located at Blvd. Kukulcan Km. 8.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

h. Grand Oasis Viva Beach, a five star hotel located at Blvd. Kukulcan Km. 8.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

i. Oasis America, a three star hotel located at Ave. Tulum Esquina Brissa s/n Sm. 4, Col. Centro, Cancun, Quintana Roo 77500 Mexico; and

j. Sens Cancun, a four star hotel located at Ave. Tulum Esquina Brissa s/n Sm. 4, Col. Centro, Cancun, Quintana Roo 77500 Mexico.

These properties are referred to as the "Hotels."

20.    Each year TravAmerica entered into various contractual relationships with traditional and web-based tour operators and marketers, travel agencies,

and travel wholesalers (hereinafter together referred to as "Tour Operators") in the United States and Canada, through which TravAmerica would sell, market, book and collect the revenue resulting from the sale of the Hotel accommodations to the Tour Operators – the Commercialization Rights.

21.     The Commercialization Rights are one of three distinct and economically valuable "bundles" of rights associated with the Hotels. The three bundles include: (1) the physical use, operation, and management of the premises ("Use Rights"), (2) branding rights for the Oasis name and mark ("Oasis Trademark Rights") and (3) marketing, sales, bookings and collections for the accommodations in the Hotels ("Commercialization Rights").

22.     On November 28, 2006, Intertravel contractually obtained from Princess Americana, S.A.R.L. ("Princess") two of the three bundles of rights; specifically, the Commercialization Rights and the Oasis Trademark Rights (the "Luxembourg Agreement"). *See* Exhibit I (First and Third Clauses), a true and correct copy and a certified translation of the Luxembourg Agreement and the relevant attachments.

23.     Princess subsequently assigned the Luxembourg Agreement to Kraainem S.A.R.L., which changed its name to Frida Investments S.A.R.L.

*See* Exhibit J, a true and correct copy of the assignment and a certified translation, as well as the name change certificate.  Intertravel consented to the assignment.

24.    For the Commercialization Rights and the Oasis Trademark Rights, Intertravel was required to pay Frida Two Million Dollars ($2,000,000) for the month of December 2006, Twenty-Eight Million Dollars ($28,000,000) for the year 2007, and Forty Two Million Six Hundred and Forty Thousand Dollars ($42,640,000) for the year 2008 with that amount increasing by 3% each successive year through the Luxembourg Agreement's term ending December 31, 2017. *See* Exhibit I, Fifth Clause.

25.    Defendant OGM obtained the third "bundle" of rights, the Use Rights, to manage and operate the Hotels on the premises, by virtue of a Joint Venture Agreement dated November 29, 2006, as the Establishing Partner, with Inmobiliaria Montecarlos, Sociedad Anonima De Capital Variable ("IMO") ("Joint Venture Agreement").  A true and correct copy of the Joint Venture Agreement, relevant attachments and a certified translation is attached hereto as Exhibit K.

26.    For the Use Rights, OGM was required to pay IMO Twelve Million Dollars ($12,000,000) for the year 2007 with that amount increasing by 3%

in each successive year through the Joint Venture Agreement's term ending December 31, 2017. Exhibit K, Clause Five, p.9 (English translation).

27.     The Joint Venture Agreement does not convey the Commercialization Rights or the Oasis Trademark Rights. The Commercialization Rights were the subject of the Luxembourg Agreement between Intertravel and Frida which conveyed them the day before to Intertravel for separate consideration in excess of $42,640,000 per year. *See* Exhibit I.

28.     The parties recognized the existence of the three distinct bundles of rights as they memorialized in separate corresponding contractual relationships the transfer of such rights to Globalia, through its wholly owned subsidiaries, OGM and Intertravel, with separate consideration for the different bundles.

29.     The Joint Venture Agreement requires OGM "to use the Hotels under the 'OASIS' brand system in conformity with the trademark use rights ...." Exhibit K, Clause 2.2(B). The "[l]oss of the Establishing Partner's [OGM's] right to use the 'OASIS' brand system" subjects OGM to early termination under the Joint Venture Agreement. Exhibit K, Clause 17(C).

30.     Intertravel sublicensed the Oasis Trademark Rights to OGM so that OGM could operate the Hotels under the Oasis brand system as required by the Joint Venture Agreement.

31.     On November 28, 2006, TravAmerica and Intertravel entered into the Services Agreement pursuant to which TravAmerica became the exclusive marketing company for the Oasis Hotels on behalf of Intertravel.  A true and correct copy of the Services Agreement is attached hereto as Exhibit D.

32.     Pursuant to the Services Agreement, Intertravel provided to TravAmerica the exclusive right to exploit the Commercialization Rights. TravAmerica could not "perform the services for any other entity ...." (Exhibit D, Section 3.1.(i)) and Intertravel could not "engage the services of any other entity in the United States of America and Canada ..." (*Id.* at 3.1.(ii)) or "book the Accommodations directly without the intervention and assistance of TravAmerica ...." (*Id.* at 3.1.(iii)).  Intertravel was thus precluded from assigning the Commercialization Rights to any other entity during the term of the Services Agreement.

33.     On November 28, 2006, Intertravel and TravAmerica entered into the Management Agreement, which gave Intertravel the right to exercise control over all significant management decisions of TravAmerica. *See* Exhibit E.

34.    Each year from November 28, 2006 until April 2010, pursuant to the rights and obligations under the Services Agreement, TravAmerica entered into contracts with Tour Operators in the United States and Canada to market the Oasis Hotels' accommodations. A true and correct copy of one of these contracts is attached hereto as Exhibit L.

35.    A dispute arose between Intertravel and Frida after Intertravel failed to meet its obligations under the Luxembourg Agreement for the year 2009. As a result, on July 6, 2009 Frida properly terminated the Luxembourg Agreement with Intertravel.

36.    This dispute was the subject of a binding arbitration held in Luxembourg. An award was issued in Frida's favor on April 7, 2010 (the "Arbitration Award"). A true and correct copy of the Arbitration Award and certified English translation of the French original is attached hereto as Exhibit M.

37.    The Arbitrator ordered, *inter alia*, that:

> 3. **The Contract of November 28, 2006 [the Luxembourg Agreement] was validly terminated by Frida by letter on July 6, 2009;**

4. **Intertravel is ordered, on the basis of Article 13 C) of the Contract [The Luxembourg Agreement], to pay Frida the amount of US $45,236,776;**...

6. Intertravel must implement all the necessary steps so that all those companies to which it had sublicensed the trademarks OASIS system [OGM] immediately stop using the trademarks, designs and logos thereof, and, within a period of twelve months, make all distinctive signs thereof disappear;

7. **Intertravel must immediately stop the utilization and commercialization/marketing rights of the hotels, Vacation Club and time-sharing included, as well as the OASIS Trademarks system, object of the Contract signed on November 28, 2006;**...

10. The provisional execution of the sentence [award] is granted;....

(*Id.* at p.37, English translation emphasis added).

38.     On May 5, 2010, the District Court of Luxembourg confirmed the Arbitration Award and entered judgment against Intertravel. A true and correct copy of the judgment (termed an "Ordonnance") is attached hereto as Exhibit N.

39.     The Ordonnance is "final, non appealable, and enforceable in Luxembourg." *See* the independent legal opinion regarding the enforcement and finality of the Arbitration Award and Ordonnance rendered in Luxembourg July 19, 2010 by Christian Gaillot of the firm Gaillot Leleu De Vleeschauwer, Avocats a la Cour, 32 avenue du X Septembre L-2550, Luxembourg a true and correct copy of which is attached hereto as Exhibit O.

40.     Proceedings to domesticate the foreign judgment (Ordonnance) are pending in Miami, Florida.

41.     The Arbitration Award holds that Frida "validly terminated" the Luxembourg Agreement. Necessarily, all sublicense agreements with respect to the Oasis Trademark Rights and the Commercialization Rights which flowed from the Luxembourg Agreement were also terminated, including but not limited to, those that may have been entered into with Globalia, Globalia Hotels, and OGM.

42.     On April 21, 2010, Intertravel expressly acknowledged the enforceability and effect of the Arbitration Award when it used affirmatively the Arbitration Award as the basis for terminating its contract with TravAmerica:

**According to an award rendered on April 7, 2010 and notified to Intertravel SARL on April 9, 2010, in an arbitration involving Frida Investments SARL ("Frida") and Intertravel SARL ("Intertravel"), Frida has effectively terminated on July 6, 2009 an agreement of November 28, 2006 with Intertravel (the "Agreement").**

**As a result of Frida's termination of the Agreement, Intertravel has lost the ability to market and sell blocks or allocations of hotel rooms and related accommodations under the OASIS trademark as contemplated by the Services Agreement between Intertravel and TravAmerica, Inc. also dated November 28, 2006.** Therefore, pursuant to Section 5.2 of the Services Agreement, the Services Agreement is terminated.

*See* Exhibit P, a true and correct copy of Intertravel's April 21, 2010 termination letter to TravAmerica, with an apostile and a cover letter from Intertravel's attorney transmitting the same (emphasis added).

43. The Arbitration Award expressly distinguishes between the Commercialization Rights and the Oasis Trademark Rights and divested Intertravel of both bundles of rights.

44. By losing the Commercialization Rights, Intertravel lost the right to market and sell the Hotel rooms under any name or brand.

45. Frida once again became the exclusive holder of the Commercialization Rights for the Hotels' accommodations, under the Oasis trademark brand and otherwise.

46. Intertravel's termination of the Services Agreement effectively shut down TravAmerica's business, and it was forced to layoff substantially all of its employees. As a result, in order to attempt to resume its business operations, it negotiated with Frida to reacquire the Commercialization Rights. It was successful in doing so, and Frida and TravAmerica entered into a contract effective as of July 1, 2010 pursuant to which TravAmerica obtained the exclusive rights to the Commercialization Rights for the Hotels' accommodations (the "TravAmerica Services Agreement"). A true and correct copy of the TravAmerica Services Agreement is attached hereto as Exhibit Q.

47.    The TravAmerica Services Agreement provides TravAmerica the authority to enforce its exclusive rights to the Commercialization Rights of the Hotels.

48.    Despite the Luxembourg judgment and Arbitration Award's final and binding effect and Intertravel's admission that its sublicensees' lost both the Commercialization Rights for the Hotels' accommodations and the Oasis Trademark Rights, Defendants have failed to comply with the Arbitration Award and the Luxembourg judgment.

49.    In furtherance of the conspiracy to misappropriate the Commercialization Rights, OGM has sent and is sending communications to Tour Operators in the United States, including in the State of Georgia, Canada and Europe, wrongfully claiming that it still possesses the Oasis Trademark Rights and the Commercialization Rights for the Hotels' accommodations.

50.    For example, on April 30, 2010, OGM sent a letter to various Tour Operators advising them that as of May 1, 2010, reservations for the Hotels would be directly booked and invoiced through OGM. A true and correct copy of the April 30, 2010 letter is attached hereto as Exhibit R.

51.    OGM also admitted to the Tour Operators that its actions were causing confusion:

> [i]t is our understanding that there is some confusion regarding the rights of [OGM] to use, commercialize, and market the trademarks and commercial names of the above mentioned [Oasis] hotels, as well as the use and operation of all the hotel's facilities.  Please accept this letter as our confirmation that through the execution of certain License and Sublicense Agreements and Joint Venture Agreements [OGM] is duly authorized to utilize such trademarks and facilities.

Exhibit R.

52.    OGM also attached a letter dated April 28, 2009 (which they later amended to reflect April 28, 20*10*) from OGM's Mexican attorneys to further mislead the Tour Operators by misrepresenting that OGM held the Commercialization Rights for the Hotels.  A true and correct copy of this letter is attached hereto as Exhibit S.  No where in this letter did the Mexican attorneys acknowledge or address the existence or significance of the Arbitration Award or that the Commercialization Rights were terminated. Exhibit S.

53.     OGM sent additional communications to the Tour Operators advising them again that beginning on May 1, 2010, "all bookings will be invoiced directly from and be paid to [OGM], the operator of the [Oasis] hotels ...." OGM sought to have the Tour Operators send all payments to a new bank account established in Miami, Florida.  Attached hereto as Exhibit T is a true and correct copy of one of these communications.

54.     OGM's efforts to illegally misappropriate the Oasis Trademark Rights and the Commercialization Rights created tremendous confusion with the Tour Operators.  For example, TravAmerica received emails and telephone calls from Tour Operators showing their confusion.  True and correct copies of some of the emails are attached hereto as composite Exhibit U.

55.     TravAmerica responded to these inquires, advising those Tour Operators that Intertravel had lost the Oasis Trademark Rights and the Commercialization Rights, and that as a result Frida held such rights.  A true and correct copy of one of these letters is attached hereto as Exhibit V.

56.     Apparently in response, OGM sent a demand letter to TravAmerica's office in Georgia, attempting to intimidate TravAmerica and two of its officers individually.  *See* Exhibit W, a true and correct copy of OGM's May 4, 2010 letter with a certified translation.

57.     In addition, OGM attempted to enter into contractual relationships with the Tour Operators, including web based Tour Operators, using TravAmerica's contract form. *Compare* Exhibit X, a true and correct copy of a contract sent by OGM to Travel Impressions and Dynamic Travel, *with* Exhibit L, a true and correct copy of TravAmerica's contract form.

58.     OGM has exploited and continues to exploit the Commercialization Rights to the Hotels in the United States, including the state of Georgia, Canada and Europe without any right to do so.  OGM has sold and marketed and continues to sell and market the Hotels' accommodations throughout the Unites States, including the State of Georgia, Canada and Europe.  OGM is currently admitting to Tour Operators, such as Transat in Ontario, Canada, that Intertravel lost the Commercialization Rights but is misrepresenting that OGM now has such rights.

59.     OGM, Globalia and/or others at their direction, are paid all revenues resulting from the misappropriation and exploitation of the Commercialization Rights and they retain all resulting income, without paying any compensation.  Prior to the termination of its rights, Intertravel paid in excess of $42,000,000 annually as consideration to exploit the

Commercialization Rights and the Oasis Trademark Rights that Defendants are now stealing.

60.     On May 26, 2010, Frida wrote to Defendants, reaffirming that Frida exclusively held the Commercialization Rights for the Hotels, and demanding they cease and desist from exploiting such rights.     Attached hereto as Exhibit Y is a true and correct copy of the May 26, 2010 letter.

61.     As part of its continuing scheme to illegally exploit the Commercialization Rights, and to further destroy TravAmerica's ability to exploit the Commercialization Rights under the Oasis name, Defendants began in July 2010 to change the names and trademarks under which they were operating the Hotels from "Oasis" to "Be Live." Attached hereto as Exhibit Z are true and correct copies of some of these letters.

62.     In    furtherance    of    their    scheme    to    misappropriate    the Commercialization Rights and destroy the Oasis brand, Defendants have programmed the Oasis Hotels' websites, www.hotelesoasis.com and www.oasishotels.com,    to    automatically    redirect    the    user    to www.belivehotels.com.    This change has created confusion in the marketplace.

63.    Creating additional confusion, the contact telephone number used for "Be Live" is 1-800-44-OASIS, which is owned by TravAmerica and which rings in TravAmerica's office.

64.    OGM has also convinced some Tour Operators in the United States, Canada, and Europe to enter into contracts with it to exploit the Commercialization Rights to the Hotels.

65.    On information and belief, one such Tour Operator, Expedia, has entered into such an agreement with OGM, which contract is believed to include a representation by Globalia that it has the right to exploit the Commercialization Rights.  On information and belief, Globalia has agreed to indemnify and hold harmless Expedia from and against any and all damages that Expedia might incur as a result of it entering into the contract. Expedia is a web based Tour Operator that markets the Hotels' accommodations via the web throughout the Untied States, including the State of Georgia, Canada, and Europe.

66.    At least one Tour Operator in Europe, Meier's Weltreisen in Germany, has executed a contract with OGM.  A true and correct copy of this contract is attached hereto as Exhibit AA.

67.     On or about July 15, 2010, Frida granted, conveyed, assigned and authorized TravAmerica to take any and all actions necessary to protect against the unauthorized use, taking, theft or misappropriation of the Commercialization Rights by any other person or company wherever located, as well as to recover any and all damages that may arise or have arisen by any unauthorized use, taking, theft or misappropriation of the Commercialization Rights arising after April 7, 2010. A true and correct copy of this Assignment Agreement is attached hereto as Exhibit BB.

68.     TravAmerica, as assignee, is entitled to sue for and obtain full and effective relief with respect to every act of unauthorized use, taking, theft or misappropriation of the Commercialization Rights occurring after April 7, 2010 for any and all causes of action, legal or equitable. *Id.*

69.     On July 23, 2010, TravAmerica demanded that Defendants immediately cease and desist from wrongfully exploiting the Commercialization Rights for the Hotels' accommodations to Tour Operators in the United States, Canada and Europe. Attached hereto as Exhibit CC is a true and correct copy of this letter.

70.     To mitigate the irreparable harm being suffered and because of the previously ignored demands, TravAmerica gave Defendants 48 hours to

comply with this directive. Despite this demand, Defendants have again failed and refused to cease their unlawful actions. Defendants' actions as alleged herein are causing and will cause the demise of TravAmerica as a going concern, and will lead to the permanent termination of all of its employees, unless restrained and enjoined from their wrongful actions.

71.     Defendants' actions as alleged herein are causing irreparable harm to TravAmerica and are a violation of the Uniform Deceptive Trade Practices Act, entitling TravAmerica to injunctive relief.

72.     Defendants' actions as alleged herein are a violation of Georgia's RICO statute, and further authorize the entry of an injunction under that Act, with or without irreparable harm.

## COUNT I – INJUNCTIVE RELIEF RESULTING FROM VIOLATION OF GEORGIA'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

73.     TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 72, above, as if set forth fully herein.

74.     TravAmerica is vested exclusively with the Commercialization Rights in the United States, Canada, and Europe, pursuant to the TravAmerica

Services Agreement with Frida. *See* Exhibit Q. TravAmerica is the owner of these contractual rights. *See* O.C.G.A. § 16-1-3(10).

75.   TravAmerica's contractual Commercialization Rights constitute property under Georgia law. O.C.G.A. § 16-1-3(13).

76.   Defendants have committed and continue to commit the offenses of theft by taking and attempted theft by taking by their unlawful attempts and actual taking and misappropriation of TravAmerica's property with the intention of depriving TravAmerica of the property. O.C.G.A. § 16-8-2.

77.   Defendants together and singularly constitute an enterprise as defined by Georgia law. O.G.C.A. § 16-14-3(6). Defendants have as a common goal the theft of TravAmerica's property; specifically, TravAmerica's Commercialization Rights. Each Defendant has had some role in directing or participating in the affairs of the enterprise.

78.   Defendants directly and indirectly have engaged in and continue to engage in a pattern of racketeering activity as that term is defined in O.C.G.A. § 16-14-3, by committing more than two violations of racketeering activity in furtherance of their scheme, which transactions have the same or similar intents, results, victims and methods of commission and are otherwise interrelated and not isolated incidents.

79.     Defendants' racketeering activity includes open and ongoing acts of theft and attempted theft of TravAmerica's property in violation of O.C.G.A. § 16-8-2.  Each separate act involving the taking or attempted taking of TravAmerica's Commercialization Rights constitutes a separate predicate act of theft or attempted theft under O.C.G.A. § 16-14-3(9)(a)(ix).  Each contract that Defendants attempt to enter or enter into with any Tour Operator is another predicate act under O.C.G.A. § 16-14-3(9)(a)(ix).  Each separate act of soliciting other persons (Tour Operators) to enter into contracts with any of the Defendants for those persons (Tour Operators) to sell accommodations at the Hotels constitutes another separate predicate act under O.C.G.A. § 16-14-3(9)(a)(ix).  In furtherance of these acts, after April 7, 2010 Defendants authorized and granted monetary discounts to traditional and web-based Tour Operators such as Expedia, Travelocity, Pleasant Holidays, Sun Wing and FunJet for them to place advertisements through the Internet and in numerous trade magazines and other publications throughout the United States, including the State of Georgia, Canada, and Europe seeking to exploit the Commercialization Rights of the Hotels and book reservations in the Hotels for their pecuniary benefit (Composite Exhibit DD).

80.    Defendants have violated O.C.G.A. § 16-14-4(a), as they, through a
pattern of racketeering activity, and/or proceeds derived therefrom, have
acquired or maintained, directly or indirectly, an interest in or control of an
enterprise and property, including money.

81.    Defendants have violated O.C.G.A. § 16-14-4(b), as they are
associated with an enterprise and have conducted and are conducting and/or
participating in, directly and indirectly, the enterprise through a pattern of
racketeering activity.

82.    Defendants have violated O.C.G.A. § 16-14-4(c), as they have
conspired or endeavored to violate the provisions of O.C.G.A. § 16-14-1, *et.
seq.*

83.    Pursuant to O.C.G.A. § 16-14-6(b), TravAmerica, as an aggrieved
person, is entitled to injunctive relief to prohibit Defendants' continued
violations of the Georgia Racketeering Influenced and Corrupt
Organizations Act.

84.    No showing of special damage or irreparable harm to TravAmerica is
required for an injunction to issue.

85.     TravAmerica is entitled to an injunction against all Defendants and any persons acting in concert with Defendants prohibiting them from exploiting and misappropriating the Commercialization Rights and income derived therefrom.

**COUNT II – REQUEST FOR INJUNCTIVE RELIEF FOR VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT (O.C.G.A. § 10-1-370 *et seq.*)**

86.     TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 85, above, as if set forth fully herein.

87.     Defendants individually and in conspiracy together in the course of their business repeatedly engaged in deceptive trade practices in violation of O.C.G.A. § 10-1-370 *et seq.*

88.     Specifically, after April 7, 2010 Defendants authorized and granted monetary discounts to traditional and web-based Tour Operators such as Expedia, Travelocity, Pleasant Holidays, Sun Wing and FunJet to place advertisements through the Internet and in numerous trade magazines and other publications throughout the United States, including the State of Georgia, Canada, and Europe seeking to exploit the Commercialization

Rights of the Hotels and book reservations in the Hotels for their pecuniary benefit (Composite Exhibit DD).

89.    These advertisements and other communications by Defendants were (and are) misleading: falsely misrepresenting to the Tour Operators and their customers, in the state of Georgia and elsewhere, that Defendants hold the Commercialization Rights and can rightfully sell and book reservations for accommodations in the Hotels.

90.    These advertisements and other communications by Defendants were (and are) misleading: falsely implying and misrepresenting to the Tour Operators and their customers, in the state of Georgia and elsewhere, that Defendants held the right to utilize the Oasis Trademark Rights.    After Defendants sought to change the Oasis name and marks to "Be Live," Defendants further confused and mislead the market.

91.    Defendants' advertisements and other actions as alleged herein are violations of Georgia's Uniform Deceptive Trade Practices Act Section 10-1-372 (a) (1), (2), (3), (5), and (12) insofar as they: (i) falsely passed off Defendants' services as the services of entities with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; (ii) were intended to and did cause confusion

and misunderstanding as to the source, sponsorship, approval and certification of the services by an entity with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; (iii) were intended to and did in fact cause confusion and misunderstanding as to the affiliation, connection, or association with or certification by an entity with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; (iv) were intended to and did in fact falsely represent that Defendants had the sponsorship, approval, affiliation and or connection to an entity with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; (v) were intended to and did in fact falsely represent that Defendants had the status of entities with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; and (vi) engaged in such conduct that created a likelihood of confusion and misunderstanding.

92.      In addition, on or after April 22, 2010 Defendants directly contacted via e-mail, fax and telephone numerous traditional and Web-based Tour Operators, many of which were among TravAmerica's former clients, for

the express purpose of improperly marketing and booking the Hotel rooms throughout the United States, including in the State of Georgia, Canada, and Europe, all for their illicit pecuniary gain. In furtherance of this illegal scheme, Defendants also proffered contracts to numerous Tour Operators, including in the State of Georgia, in an attempt to market, sell and book the Hotels' accommodations in contravention of TravAmerica's rights.

93.     These contacts with TravAmerica's former clients and others violate Georgia's Uniform Deceptive Trade Practices Act Section 10-1-372 (a) (1), (2), (3), (5), and (12) insofar as they: (i) falsely passed off Defendants' services as the services of entities with the legal right to the Commercialization Rights  to book the Hotels' accommodations and utilize the Oasis Trademark Rights; (ii) were intended to and did cause confusion and misunderstanding as to the source, sponsorship, approval and certification of the services by an entity with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; (iii) were intended to and did in fact cause confusion and this understanding as to the affiliation, connection, or association with or certification by an entity with the legal right to the Commercialization Rights  to book the Hotels' accommodations and utilize

the Oasis Trademark Rights; (iv) were intended to and did in fact falsely represent that Defendants had the sponsorship, approval, affiliation and or connection to an entity with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; (v) were intended to and did in fact falsely represent that Defendants had the status of entities with the legal right to the Commercialization Rights to book the Hotels' accommodations and utilize the Oasis Trademark Rights; and (vi) engaged in such conduct that similarly created a likelihood of confusion and misunderstanding.

94.     Defendants continue to pursue their improper, unlawful, confusing and misleading misappropriation of the Commercialization Rights and book the Hotels' accommodations throughout the United States, including the state of Georgia, Canada, and Europe, for their pecuniary benefit, at times in violation of the Oasis marks and at other times under different marks including, without limitation, the "Be Live" brand and marks.

95.     TravAmerica and Frida have repeatedly demanded that Defendants cease and desist conducting the foregoing improper activities to no avail. *See* Exhibits Y and CC.

96.     Defendants' unlawful activities continue to cause misunderstanding, confusion and irreparable harm to TravAmerica, including damage to its reputation and good will cultivated over the last 18 years all in violation of Georgia's Uniform Deceptive Trade Practices Act thereby entitling TravAmerica to injunctive relief under O.C.G.A.§ 10-1-373 *et seq.*, on such terms that the court considers reasonable to compel Defendants immediately to cease and desist misappropriating the Commercialization Rights for the Hotels' accommodations.

97.     The foregoing activities were engaged in and continue to be engaged in willfully by Defendants when they knew them to be deceptive, misleading, fraudulent and unlawful in direct contravention of the Arbitration Award, the Luxembourg District Court Judgment, and TravAmerica's rights. TravAmerica is, therefore, entitled to recover from Defendants individually, jointly and severally TravAmerica's costs and attorney's fees incurred in bringing this action pursuant to O.C.G.A.§ 10-1-373 (b) (2).

98.     By reason of Defendants' wrongful actions, TravAmerica has suffered and will continue to suffer extreme hardship, actual damages and irreparable harm.

### COUNT III – DAMAGES RESULTING FROM DEFENDANTS' VIOLATION OF GEORGIA'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS STATUTE

99.     TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 98, above, as if set forth fully herein.

100.    TravAmerica is vested exclusively with the Commercialization Rights in the United States, Canada, and Europe, pursuant to the TravAmerica Services Agreement with Frida. *See* Exhibit Q. TravAmerica is the owner of these contractual rights. *See* O.C.G.A. § 16-1-3(10).

101.    TravAmerica's contractual Commercialization Rights constitute property under Georgia law. O.C.G.A. § 16-1-3(13).

102.    Defendants have committed and continue to commit the offense of theft by taking and attempted theft by taking by their unlawful attempts to and actual taking and misappropriation of TravAmerica's property with the intention of depriving TravAmerica of the property. O.C.G.A. § 16-8-2.

103.    Defendants together and singularly constitute an enterprise as defined by Georgia law. O.G.C.A. § 16-14-3(6). Defendants have as a common goal the theft of TravAmerica's property; specifically, TravAmerica's

Commercialization Rights. Each Defendant has had some role in directing or participating in the affairs of the enterprise.

104.   Defendants directly and indirectly have engaged and continue to engage in a pattern of racketeering activity as that term is defined in O.C.G.A. § 16-14-3, by committing more than two violations of racketeering activity in furtherance of their scheme, which transactions have the same or similar intents, results, victims and methods of commission and are otherwise interrelated and not isolated incidents.

105.   Defendants' racketeering activity includes open and ongoing acts of theft and attempted theft of TravAmerica's property in violation of O.C.G.A. § 16-8-2. Each separate act involving the taking or attempted taking of TravAmerica's Commercialization Rights constitutes a separate predicate act of theft or attempted theft under O.C.G.A. § 16-14-3(9)(a)(ix) . Each contract that Defendants attempt to enter or enter into with any Tour Operator is another predicate act under O.C.G.A. § 16-14-3(9)(a)(ix). Each separate act of soliciting other persons (Tour Operators) to enter into contracts with any of the Defendants for those persons (Tour Operators) to sell accommodations at the Hotels constitutes another separate predicate act under O.C.G.A. § 16-14-3(9)(a)(ix). In furtherance of these acts, after April

7, 2010 Defendants authorized and granted monetary discounts to traditional and web-based Tour Operators such as Expedia, Travelocity, Pleasant Holidays, Sun Wing and FunJet for them to place advertisements through the Internet and in numerous trade magazines and other publications throughout the United States, including the State of Georgia, Canada, and Europe seeking to exploit the Commercialization Rights of the Hotels and book reservations in the Hotels for their pecuniary benefit (Composite Exhibit DD).

106. Each contract exploiting or attempting to exploit the Commercialization Rights of the Hotels' accommodations that OGM enters with a Tour Operator constitutes a separate predicate act of theft of TravAmerica's Commercialization Rights.

107. Defendants have violated O.C.G.A. § 16-14-4(a), as they, through a pattern of racketeering activity, and/or proceeds derived therefrom, have acquired or maintained, directly or indirectly, an interest in or control of an enterprise and property, including money.

108. Defendants have violated O.C.G.A. § 16-14-4(b), as they are associated with an enterprise and have conducted and are conducting and/or

participating in, directly and indirectly, the enterprise through a pattern of racketeering activity.

109.   Defendants have violated O.C.G.A. § 16-14-4(c), as they have conspired or endeavored to violate the provisions of O.C.G.A. § 16-14-1, *et seq.*

110.   As a direct and proximate result of Defendants' violations of the Georgia Racketeering Influenced and Corrupt Organizations Act, TravAmerica has suffered damages in an amount exceeding $75,000, the exact amount to be determined at trial.   The damages resulting from Defendants' RICO violations include, but are not limited to, the earnings generated by Defendants as a result of their theft of TravAmerica's Commercialization Rights and the sale of the Hotels' accommodations in contravention of TravAmerica's ownership rights thereto.

111.   TravAmerica is entitled to recover three times its actual damages determined at trial.

### COUNT IV – MISAPPROPRIATION/THEFT OF CONTRACT RIGHTS

112.   TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 111, above, as if set forth fully herein.

113.   TravAmerica is lawfully and exclusively vested with the Commercialization Rights, beginning July 1, 2010, and it has been assigned by Frida any and all causes of action relating to the misappropriation of the Commercialization Rights for the period arising after April 7, 2010.

114.   The Commercialization Rights are property rights of great value, usually in excess of $50,000,000 each year.

115.   Since at least April 8, 2010, Defendants individually and in concert and conspiracy, both directly and through the actions of others at Defendants' direction and control, have taken unauthorized dominion and control over the Commercialization Rights, as well as illegally retaining monies obtained as a result of their improper exploitation of the Commercialization Rights, in contravention of TravAmerica's rights.

116.   Defendants' dominion and control over and misappropriation of the Commercialization Rights has been to the exclusion of, and in defiance of, TravAmerica's rights, and has otherwise interfered with and usurped the rights of TravAmerica in and to the Commercialization Rights.

117.   TravAmerica has been damaged by Defendants' wrongful actions in an amount in excess of $75,000, the exact amount to be proven at trial.

## COUNT V—ALTER EGO

118. TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 117, above, as if set forth fully herein.

119. The Defendants are all related entities with common ownership and control. Globalia is ultimately the 100% owner of OGM, Intertravel, and Globalia Hotels.

120. Defendants have disregarded the separateness of the legal entities by the commingling and confusion of money, property, records, operations, personnel and control.

121. Defendants have conducted their corporate business on an interrelated, interchangeable and joint basis as if all Defendants were one entity.

122. Defendants have each used Intertravel as a mere instrumentality or business conduit for the transaction of the overall Globalia business such that there is a unity of interest and ownership and the separate personalities of the corporations no longer exist.

123. Defendants have used Intertravel in order to defeat and evade justice, perpetrate fraud, and to evade contractual responsibility.

124. As a result of their actions as alleged herein, Defendants are alter egos.

### COUNT VI – CONSPIRACY

125. TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 124, above, as if set forth fully herein.

126. Defendants, and each and every one of them, agreed and/or combined to engage in a civil conspiracy to commit the unlawful acts as described in this complaint.

127. Defendants, and each and every one of them, combined to engage in a civil conspiracy of which the principal element was to inflict wrongs against and/or an injury on TravAmerica as described in this Verified Complaint.

128. Defendants, and each and every one of them, combined to engage in a civil conspiracy that was furthered by overt acts.

129. Defendants, each and every one of them, understood, accepted, and/or explicitly and/or implicitly agreed to the general objectives of their scheme to inflict the wrongs and injuries on TravAmerica as described in this Verified Complaint.

130.   As a result of this conspiracy, each Defendant is liable for every act committed by any other Defendant.

## COUNT VII – ATTORNEYS' FEES

131.   TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 130, above, as if set forth fully herein.

132.   Because Defendants' intentional malfeasance constitutes bad faith and because they have been stubbornly litigious and caused TravAmerica unnecessary trouble and expense, TravAmerica is entitled to recover its expenses of litigation, including its attorneys' fees pursuant to O.C.G.A. § 13-6-11.

133.   Under Georgia's RICO Act, TravAmerica is entitled to recover its expenses of litigation, including its attorneys' fees, pursuant to O.C.G.A. § 16-14-6(c).

134.   Under Georgia's Uniform Deceptive Trade Practices Act, TravAmerica is entitled to recover its expenses of litigation, including its attorneys' fees.

## COUNT VIII
## PUNITIVE DAMAGES

135.   TravAmerica incorporates herein by reference each and every allegation set forth in paragraphs 1 through 134, above, as if set forth fully herein.

136.   Defendants' actions alleged herein demonstrate knowing and intentional malfeasance and show a willful, wanton and conscious disregard for the rights of TravAmerica.

137.   Defendants' actions show intentional and willful misconduct, malice, fraud, wantonness, oppression or that entire want of care that would raise the presumption of a conscious indifference to the consequences of their actions so as to entitle TravAmerica to punitive damages against all Defendants in accordance with Georgia law in an amount to be determined by the enlightened conscience of a fair and impartial jury.

138.   Under Georgia's RICO Act, TravAmerica is entitled to an award of punitive damages against all Defendants.

139.   Defendants have acted with the specific intent to harm TravAmerica such that TravAmerica is entitled to an award of punitive damages in excess of the $250,000 statutory cap.

**WHEREFORE**, TravAmerica requests that this court:

1.    Issue a temporary restraining order and a preliminary injunction pursuant to Georgia's Uniform Deceptive Trade Practices Act, Georgia's RICO Act, and Fed. R. Civ. P. Rule 65, to restrain and enjoin Defendants, their agents, employees, successors, affiliates, attorneys, and all persons in active concert and participation with them, from using, advertising, exploiting, taking, stealing or misappropriating TravAmerica's exclusive rights, in the United States, Canada and Europe, to market, sell, book, and commercialize the hotel properties listed below, whether under the "Oasis" brand and marks or any other name, brand, or marks, which includes: (i) soliciting, entering or attempting to enter into contracts or otherwise conducting business with traditional and web-based tour operators and marketers, travel agencies and travel wholesalers to market, sell, book, and commercialize the hotels' accommodations in the United States, Canada and Europe; (ii) conducting any advertising (whether in print, radio, television or by Internet), marketing, sales, reservations, and bookings of the hotels' accommodations to individuals and companies in the United States, Canada and Europe; and (iii) directly or indirectly collecting any monies resulting from marketing, sales, reservations, and bookings of the hotels' accommodations in the United States, Canada and Europe.  The hotel properties to which the Temporary Restraining Order shall apply include:

a. Grand Oasis Cancun, a five star hotel located at Blvd. Kukulcan Km. 16.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

b. Oasis Cancun, a four star hotel located at Blvd. Kukulcan Km. 16.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

c. Grand Oasis Playa, a five star hotel located at Blvd. Kukulcan Km. 19.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

d. Grand Oasis Rivera Maya, a five star hotel located at Km. 251 Carretera Chetumal, Puerto Juarez, Akumal, Quintana Roo 77780 Mexico;

e. Oasis Palm Beach, a four star hotel located at Blvd. Kukulcan Km. 4.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

f. Grand Oasis Caribbean Resort, a five star hotel located at Blvd. Kukulcan Km. 4.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

g. Oasis Viva Beach, a four star hotel located at Blvd. Kukulcan Km. 8.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

h. Grand Oasis Viva Beach, a five star hotel located at Blvd. Kukulcan Km. 8.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

i. Oasis America, a three star hotel located at Ave. Tulum Esquina Brissa s/n Sm. 4, Col. Centro, Cancun, Quintana Roo 77500 Mexico; and

62

j. Sens Cancun, a four star hotel located at Ave. Tulum Esquina Brissa s/n Sm. 4, Col. Centro, Cancun, Quintana Roo 77500 Mexico.

2.    Issue a permanent injunction perpetually restraining and enjoining Defendants, their agents, employees, successors, affiliates, attorneys, and all persons in active concert and participation with them, from using, advertising, exploiting, taking, stealing or misappropriating TravAmerica's exclusive rights, in the United States, Canada and Europe, to market, sell, book, and commercialize the hotel properties listed below, whether under the "Oasis" brand and marks or any other name, brand, or marks, which includes: (i) soliciting, entering or attempting to enter into contracts or otherwise conducting business with traditional and web-based tour operators and marketers, travel agencies and travel wholesalers to market, sell, book, and commercialize the hotels' accommodations in the United States, Canada and Europe; (ii) conducting any advertising (whether in print, radio, television or by Internet), marketing, sales, reservations, and bookings of the hotels' accommodations to individuals and companies in the United States, Canada and Europe; and (iii) directly or indirectly collecting any monies resulting from marketing, sales, reservations, and bookings of the hotels'

accommodations in the United States, Canada and Europe. The hotel properties to which the Temporary Restraining Order shall apply include:

a. Grand Oasis Cancun, a five star hotel located at Blvd. Kukulcan Km. 16.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

b. Oasis Cancun, a four star hotel located at Blvd. Kukulcan Km. 16.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

c. Grand Oasis Playa, a five star hotel located at Blvd. Kukulcan Km. 19.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

d. Grand Oasis Rivera Maya, a five star hotel located at Km. 251 Carretera Chetumal, Puerto Juarez, Akumal, Quintana Roo 77780 Mexico;

e. Oasis Palm Beach, a four star hotel located at Blvd. Kukulcan Km. 4.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

f. Grand Oasis Caribbean Resort, a five star hotel located at Blvd. Kukulcan Km. 4.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

g. Oasis Viva Beach, a four star hotel located at Blvd. Kukulcan Km. 8.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

h. Grand Oasis Viva Beach, a five star hotel located at Blvd. Kukulcan Km. 8.5, Hotel Zone, Cancun, Quintana Roo 77500 Mexico;

i. Oasis America, a three star hotel located at Ave. Tulum Esquina Brissa s/n Sm. 4, Col. Centro, Cancun, Quintana Roo 77500 Mexico; and

j. Sens Cancun, a four star hotel located at Ave. Tulum Esquina Brissa s/n Sm. 4, Col. Centro, Cancun, Quintana Roo 77500 Mexico.

3.      Award to TravAmerica all damages it has suffered, in an amount to be proven at trial as well as awarding treble damages for Defendants' violation of Georgia's RICO Act;

4.      Award to TravAmerica punitive damages in excess of the statutory cap of $250,000 in an exact amount to be determined at trial;

5.      Award to TravAmerica its reasonable attorney's fees and expenses of litigation; and

6.      Award plaintiff such other and further relief as this court may deem proper.

Respectfully submitted this 5 day of August, 2010.

THE STROTT LAW FIRM


By:_____
        Peter H. Strott
        Georgia Bar No.  689150
        Robert Tifverman
        Georgia Bar No. 712140
        Melissa Dillon
        Georgia Bar No. 324030
        Attorneys for Plaintiff

Two Ravinia Drive, Suite 1500
Atlanta, GA  30346
(404) 920-0509, telephone
(404) 239-1179 - fax
pstrott@strottlawfirm.com


**Of Counsel:**

Gorby Peters & Associates, P.C.
Michael J. Gorby
Georgia Bar No. 301950
Two Ravinia Drive, Suite 1500
Atlanta, GA 30346
(404) 239-1150, telephone
(404) 239-1179, facsimile
mgorby@gorbypeters.com